**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
LIBERTY MUTUAL INSURANCE CO.,

                        Plaintiff,

              - against -

BELLA TRANSPORTATION, et al.,

                      Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

CV 07-0716 (CBA) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

       Liberty Mutual Insurance Company ("Liberty") commenced this action on February 21, 2007, against defendants Bella Transportation, Inc. ("Bella"), Boris Kurbatsky Insurance Brokerage Corp. ("BKI"), Boris Kurbatsky ("Kurbatsky"), Big A Brokerage Corp. ("Big A"), Aleksandr Savranskiy ("Savranskiy"), and Ilya Promysloysky ("Promysloysky"), seeking relief based on misrepresentations made in Bella's insurance application and Bella's failure to pay insurance premiums.  Docket Entry ("DE") 1 (Complaint).  In the 26 months that have passed since then, Liberty has done virtually nothing to prosecute its case, and still less that has not occurred as a direct result of prodding from this court.  On April 7, 2009, I ordered Liberty to show cause why I should not recommend the dismissal of its claims for failure to prosecute.  In response, it submitted a letter that asked me not to do so, without providing any explanation for its continued inaction.  On April 14, 2009, reiterating my concern that continued forbearance jeopardized this court's impartial role, I gave Liberty one final opportunity to show good cause why I should not recommend dismissal.  In response, Liberty conceded that it had not acted "expeditiously," DE 40, but argued that dismissal would be unduly harsh.  Nevertheless, for the reasons set forth below, I respectfully recommend that the court dismiss Liberty's Amended Complaint with prejudice for failure to prosecute its case.

I.    Background

This is the second Report and Recommendation I have issued in this case.  The first one,

DE 26 (the "R&R"), analyzed Liberty's motion for default judgments against the defendants who

did not respond to its initial Complaint.  Although the R&R summarized the facts (as alleged in

Liberty's original complaint) and the procedural history of this case up through that stage of the

proceedings, I nevertheless repeat much of that history here because of its salience to the issue of

Liberty's failure to prosecute.  As before, I assume the truth of the factual allegations in Liberty's

pleadings – except where, as noted, they are inconsistent with other facts Liberty has already

proved in this case.

A.    Facts

The dispute at the heart of this case is Liberty's claim that, as a result of the defendants'

participation in a fraudulent scheme, it provided Bella with insurance at a lower rate than it

would properly have charged if it had known the true nature of Bella's business.  The charged

scheme involves two groups of participants, whom I shall call, respectively, the Car Service

Defendants and the Broker Defendants.  The Car Service Defendants include Bella, which

operates a for-hire car service in the New York metropolitan area, and its owner Promysloysky.

The Broker Defendants include BKI and Big A, each of which has represented Bella at various

times, as well as the owners of those entities:  Kurbatsky and Savranskiy,[1] respectively.  DE 32

(Amended Complaint) ¶¶ 4-8.

_____

[1]  Although several entries on the docket render this party's last name, apparently incorrectly, as
"Savrandkiy" I will use the spelling found in the Complaint.

The scheme that Liberty alleges involves the improper manipulation of the New York Automobile Insurance Plan (the "Plan"), which the State of New York established to make it possible for high-risk individuals and businesses to purchase insurance coverage from insurers who would otherwise be reluctant to issue them policies. Amended Complaint ¶¶ 12-13. Specifically, state law requires that any company that seeks to participate in the voluntary insurance market must also provide coverage through the Plan as a last resort to those who have tried and failed to secure a policy in the voluntary market. Such coverage is available under the Plan to, among others, operators of "public service vehicles" that provide public transportation for New York citizens. Amended Complaint ¶¶ 13-15.

A public automobile transportation service seeking to purchase insurance under the Plan submits an application to the Plan itself through an insurance broker. If the client is approved for insurance under the Plan, it is thereafter assigned for coverage to one of the participating insurance companies; as a result, the applicant does not know in advance which insurance company will provide the coverage. *See* Amended Complaint ¶ 39.

It is the Plan itself that initially determines the premium that the assigned company may charge the client for its insurance coverage, and it does so based on a formula that includes such factors as the risk of the "rating territory" (meaning the geographical area in which the covered driving occurs); the "rating classification" (referring to the type of service provided); the radius of operation; the number of vehicles in operation; and the ownership status of the vehicles. Amended Complaint ¶ 22. Where a client operates its vehicles in multiple rating territories, the Plan calculates the premium based on the territory with the highest rating – that is, the territory with the highest risk, which produces the highest premium. *See* Amended Complaint ¶ 25.

Although the Plan makes the initial determination about the premium to be charged, the application for coverage under the Plan explicitly acknowledges that the insurance company that is assigned to provide coverage enjoys "the right to adjust the premium either prior to or after the issuance of the policy, whenever applicable." Amended Complaint ¶ 34.

An applicant seeking insurance under the Plan must certify that the statements it includes in its application "are true and that [they] are offered as an inducement to issue the policy for which the Applicant is applying." Amended Complaint ¶ 37. The broker also signs the application, and attests that "I have read the [Plan], have explained the provisions to the applicant, and have included in this application all required information given to me by the applicant." Amended Complaint ¶ 38. The broker also acknowledges that it is "acting on behalf of the Applicant in submitting [the] application[.]" Amended Complaint ¶ 49.

BKI submitted an application to the Plan on behalf of Bella dated February 5, 2002. Amended Complaint ¶ 43.[2] In its application, Bella claimed that it had one vehicle and operated

---

[2] In its original Complaint, which did not include the application as an exhibit, Liberty alleged that the document was dated April 28, 2004. Complaint ¶ 43. After Liberty submitted the application as an exhibit to the papers supporting its default motion, I noted that the document actually bore a date of "2/5/02." R&R at 4 n.2. The Amended Complaint corrects that earlier error.

Of more substantive concern is Liberty's recent allegation that Kurbatsky personally submitted Bella's application, along with BKI. Amended Complaint ¶ 43. As I explained in the R&R, Liberty's original Complaint failed to state a negligent misrepresentation claim against Kurbatsky, in part because of the absence of any indication that Kurbatsky had engaged in any individual misconduct – a deficiency that had previously led to the dismissal of Liberty's claim against Kurbatsky in another similar case. R&R at 13-14 & n.8 (citing *Liberty Mut. Ins. Co. v. First Brighton Transp., Inc.*, 2008 WL 1787684, at *3-*5 (E.D.N.Y. Apr. 17, 2008)). Having had the same error explained to it twice, Liberty finally added a conclusory allegation to its Amended Complaint that Kurbatsky personally submitted Bella's application. That allegation is inconsistent with the proof, which Liberty previously submitted to this court, that the only party submitting the application as Bella's broker was BKI. *See* DE 23-2 (copy of application).

a "van pool" in Highland, New York. Amended Complaint ¶¶ 45-47.[3] Liberty thereafter issued

an insurance policy to Bella, charging a premium based on the information in the application.

Amended Complaint ¶ 50. That policy took effect on February 6, 2002.[4] Amended Complaint

¶ 51.

At some point after the policy was initially issued, Big A (owned by Savranskiy) became

Bella's insurance broker. Amended Complaint ¶ 54. Liberty issued various renewals of the

policy – which remained in effect until its cancellation on July 11, 2004, Amended Complaint

¶ 51 – but it is not clear from the Amended Complaint what, if anything, Big A or its owner

Savranskiy did to help Bella secure any such renewals. Big A, like its predecessor BKI, did

allegedly submit requests to have Liberty add additional vehicles to the policy, which requests

---

[3]  Liberty now further alleges that Promysloysky (Bella's owner), BKI (the broker), and
Kurbatsky (the broker's owner) also attested to the same facts about the nature of Bella's
business. Amended Complaint ¶¶ 45-46. Here again, the application itself plainly reveals that
the only person who attested to the truth of facts set forth about Bella's business was the person
who signed the "Applicant Statement" on Bella's behalf. DE 23-2. Although that signature is
illegible, Liberty now alleges, and I assume is in a position to prove, that the person who signed
the "Applicant Statement" was Promysloysky. Amended Complaint ¶ 64. The terms of the
application make clear that the broker need not and does not attest to the truth of any description
of the applicant's business. DE 23-2. It therefore demonstrably untrue that "[t]hrough the
Application ... BKI [and] Kurbatsky ... *attested* that Bella had one vehicle" or that the same
parties "attested that Bella operated a 'van pool[.]'" Amended Complaint ¶¶ 45-46 (emphasis
added). Liberty may be in a position to prove, as it later alleges, that BKI and Kurbatsky knew
that the application's contents were false and that they conspired with Bella and Promysloysky to
defraud Liberty, but it seems apparent that Liberty will never be in a position to prove that BKI
or Kurbatsky "attested" to anything at all in the application. But for Liberty's documented
history of careless submissions in this and similar cases, it would be difficult to ascribe the
inclusion of such an obviously false allegation to anything other than a willful violation of
Federal Rule of Civil Procedure 11(b)(3).

[4]  Yet again, Liberty has alleged a fact at odds with the evidence it has previously submitted,
albeit one of no particular significance. In seeking a default judgment on its original complaint,
Liberty submitted an affidavit by an employee who swore that the policy issued to Bella took
effect on February 25, 2002. DE 23 (Affidavit of Perola Andersson) ¶ 4.

Liberty granted, but the Amended Complaint makes no allegation as to any factual statements provided in support of those requests. *See* Amended Complaint ¶ 55.

Liberty later learned that Bella operated a for-hire car service in Kings County, New York rather than a van pool service in Highland, New York. Amended Complaint ¶ 56. Liberty raised the premium accordingly and billed Bella for the additional amount it claimed Bella should have paid – a total of $170,808 in underpayment, which Liberty now seeks in damages. Amended Complaint ¶¶ 57-58. Bella did not pay the requested amount. Amended Complaint ¶ 75.

B.    Proceedings

Liberty filed its original Complaint on February 21, 2007. DE 1. It asserted a total of five common law causes of action:  breach of contract, negligent misrepresentation, two counts of intentional misrepresentation, and unjust enrichment.

Only Kurbatsky filed a timely answer. DE 2. Over four months after Liberty filed its complaint, I scheduled an initial conference. DE 3. By that time, Liberty had not yet filed any affidavits of service of process, nor had it done anything else to prosecute the case. On June 25, 2007, three days after I issued the order scheduling the initial conference, Liberty belatedly filed proof that it had served each defendant late March and early April 2007. DE 4; DE 5; DE 6; DE 7; DE 8; DE 9. Based on the affidavits of service, it appeared that all of the defendants had been in default for at least two months prior to the date of the initial conference. Nonetheless, Liberty did not take any steps to institute default proceedings until I instructed it to do so promptly. *See* DE 11 (minute entry for conference on July 6, 2007).

Later that same day, Liberty filed three requests, pursuant to Federal Rule of Civil Procedure 55(a), to enter default as to BKI, Big A, and Savranskiy, respectively. Each such request included a one-page request, a one-page proposed notation of default, and a two-page declaration by Liberty's counsel explaining why the Clerk should sign the proposed notation. DE 12; DE 13; DE 14. As requested, the Clerk entered a notation of default as to those three parties. DE 15; DE 16; DE 18.

Liberty did not take similar steps to pursue default remedies against the other three defendants. Although the Car Service Defendants (Bella and Promysloysky) had also failed to answer by the date of the initial conference, Liberty's counsel reported that he had been in contact with an attorney who anticipated representing those defendants. I therefore ordered Liberty to report on the status of the Car Service Defendants by July 20, 2007, and either agree to extend their time to answer the complaint or move for a default judgment. DE 11. Liberty did neither, and instead unilaterally decided to wait for the Car Service Defendants to file their answer, which they eventually did on September 14, 2007. *See* DE 19.[5] From the latter date

[5] Liberty did comply with the order requiring it to report on the status of the car service defendants by July 20, 2007. Specifically, its counsel reported that he had received a call from an attorney who transmitted a request from Bella and Promysloysky for an extension of the time to respond to the Complaint, and who promised to help those parties look for "competent counsel." DE 17. After making that report, Liberty's attorney concluded, "Provided that this request is acceptable to your Honor, I have consented." *Id*. The request was not acceptable, because the person who had transmitted it did not represent any party in the litigation. Accordingly, to ensure that Liberty was not laboring under any mistaken understanding, I noted that "[a] request by an attorney who does not represent a party has no effect on the litigation. If any party in this case makes an application, I will consider it." Order dated July 23, 2007. As a result, the order of July 6, 2007, requiring Liberty promptly to commence default proceedings against any non-appearing defendant, remained in effect. The Car Service Defendants eventually answered the original Complaint. *See* DE 20. That Complaint was dismissed before Liberty did anything further to prosecute its claims against the Car Service Defendants.

until I issued my earlier R&R over nine months later, Liberty did nothing to advance the litigation of its claims against the Car Service Defendants (nor has it done anything since).

Liberty also failed to take the steps necessary to pursue a default remedy against Kurbatsky. By the time of the initial conference on July 6, 2007, it had become apparent that Kurbatsky would not participate in this litigation, and would ultimately be subject to a default judgment, notwithstanding the fact that he had already answered. *See* DE 11. Nevertheless, for reasons that Liberty has never explained, it did not move to strike Kurbatsky's Answer or ask the Clerk to enter Kurbatsky's default on the basis of his failure to defend; as a result, the Clerk never had occasion to note Kurbatsky's default on the docket. *See* Fed. R. Civ. P. 55(a).

On January 15, 2008, the Honorable Carol Bagley Amon, United States District Judge, referred the requests for the entry of default against three defendants to me for a recommendation as to an appropriate award. DE 21.[6] Upon receiving the referral from Judge Amon, I issued the following order:

> The plaintiff is directed to submit any written materials in support of its request for damages or other relief (including, if applicable, reasonable attorneys' fees), including any affidavits, exhibits, or memoranda of law that the plaintiff wishes me to consider no later than February 6, 2008, with copies simultaneously provided to the defendants. If the plaintiff wishes to present witnesses in support of its motion, it must also provide a list of all such witnesses, and I will schedule proceedings accordingly. *This will be the plaintiff's final opportunity to present argument or evidence in support of any request for relief*. The plaintiff is further directed to serve a copy of this order on each defendant and to electronically file proof of such service no later than January 23, 2008. Any defendant that wishes to make a submission in response must do so no later than February 6, 2008.

---

[6] Although the requests for the entry of default had already been resolved by virtue of the Clerk's action, the referral was plainly intended to cover the motion for default judgment that all concerned anticipated would soon follow. Once that motion was actually filed, DE 23, the Clerk terminated the previously-referred motions on the docket and Judge Amon referred the instant motion to me for this report and recommendation. *See* docket entries dated February 27, 2008.

Order dated January 16, 2008 (emphasis added).

On February 2, 2008 (having already timely served the defendants with my order, *see* DE 22), Liberty filed a motion for default judgment against all four Broker Defendants, including the three as to whom the Clerk had already noted a default on the docket, as well as Kurbatsky, as to whom no default had then (or ever) been entered. DE 23. Although Liberty docketed the papers it submitted as a "motion," it was in fact nothing of the sort. Instead, the document that Liberty filed was a five-page affidavit by its investigator to which were appended three exhibits: the two-page application to the Plan; a one-page table apparently showing the premiums that Liberty had originally charged Bella, and a copy of the one-page invoice that Liberty later sent to Bella. *Id*. Liberty did not submit a notice of motion, a memorandum of law, or any evidence that any of its "motion" papers had been served on the defendants. I therefore entered an order directing Liberty to show cause, no later than March 3, 2008, why I should not recommend that the court deny its motions for failure to comply with Local Civil Rule 7.1 and my order of January 16, 2008. DE 24. On February 29, 2008, rather than explain the patently obvious defects in its motion or attempt to show cause why they should be overlooked, Liberty filed a letter requesting leave to re-file its motion. DE 25. Liberty submitted nothing thereafter in support of its motion.

On June 26, 2008, I recommended that the court deny the motion for default judgments and instead dismiss the claims against the Broker Defendants with prejudice. In explaining that recommendation, I first recounted the factual and procedural history described above. R&R at 2-8. I then explained that as a procedural matter, Liberty's failure to submit a memorandum of law, as required by Local Civil Rule 7.1(a), was a sufficient basis for the result I recommended, as was its failure to show cause why I should excuse those lapses when given an opportunity to do

so.  Moreover, Liberty's failure to secure the entry of Kurbatsky's default on the docket was an additional procedural reason to deny relief as to that defendant.  R&R at 8-10.[7]

I further explained that, even if the court were to ignore Liberty's procedural failings, there would be no basis for awarding judgment on any of its claims for substantive reasons.  As to defendants Savranskiy, Kurbatsky, and Big A, Liberty had not pleaded sufficient facts to demonstrate liability; as a result, the fact that the defendants' default served to admit the complaint's factual allegations did not entitle Liberty to any relief.  R&R at 15-18.  With respect to defendant BKI, I noted that the complaint did allege sufficient facts to support a finding of liability, but that Liberty, despite ample opportunity including an explicit invitation from the court, had failed to submit evidence that would prove its damages to any reasonable certainty.  R&R at 18-22.

I therefore recommended that the court deny Liberty's motion for default judgments against the four defendants at issue.  In addition, I recommended that the court dismiss Liberty's claims with prejudice for failure to prosecute.  Taking into account the five *Drake* factors,[8] I explained why I believed that dismissal with prejudice was appropriate as a result of Liberty's many lapses to date:

_____

[7]  In light of this procedural defect, Liberty withdrew its motion for a default judgment against Kurbatsky when it filed objections to other aspects of the R&R.  DE 28 at 2.

[8]  In a recent decision on the scope of a district court's authority to dismiss a case with prejudice for failure to prosecute, the United States Court of Appeals for the Second Circuit used "the *Drake* factors" as a convenient shorthand term for the relevant inquiry.  *Lewis v. Rawson*, --- F.3d ----, 2009 WL 1119651, at *4-*5 (2d Cir. Apr. 28, 2009) (citing *United States ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 254 (2d Cir. 2004)).  I applied those same factors but cited cases other than *Drake* in doing so.  *See* R&R at 23 (citing *Jenkins v. City of New York*, 176 F.R.D. 127, 128-129 (S.D.N.Y. 1997); *Jackson v. City of New York*, 22 F.3d 71, 74 (2d Cir. 1994)).

Liberty began this case by filing a boilerplate Complaint that was legally insufficient and in certain respects demonstrably untrue.  Since then it has ignored its obligations and failed to take actions to vindicate its interests without affirmative prompting from the court – and sometimes not even with such prompting.   When ordered to show cause why its conduct should not result in the denial of relief, it did not even attempt to do so, but instead just asked for further indulgence of its inattention to the case.  Liberty's neglect has needlessly burdened the court, and it has persisted in that negligence even after being warned that doing so could result in the dismissal of its claims.  *See* DE 24.  Liberty's failure to comply with its obligations suggests that it has no interest in seeking the relief requested in the Complaint – or more precisely, that it is uninterested in securing such relief if it must exert any substantive effort to do so.

R&R at 23-24.

On July 17, 2008, Liberty filed a letter setting forth its objections to the R&R.  DE 28.  It began by seeking to withdraw its request for default judgments – *i.e.*, the precise request for relief that had produced the recommendation to which it objected – and noting its intention to file a motion to consolidate this case with several other similar claims.  DE 28 at 1.[9]  It then apologized for some of its procedural lapses and went on to describe evidence that it had obtained that it asserted supported its claims – evidence that Liberty had never submitted despite explicit instructions to do so.  DE 28 at 2-3; *see* Order Dated January 16, 2008 (providing Liberty with a "final opportunity to present argument or evidence in support of any request for relief").  Liberty continued by disagreeing with my assessment of the substantive reasons for denying it the relief it no longer sought.  DE 28 at 3-4.  Liberty concluded by objecting to my recommendation that the case be dismissed with prejudice, arguing that it should instead be given an opportunity to amend its complaint.  DE 28 at 4.

---

[9]  As far as the docket of this case reflects, Liberty has never made such a motion.

On September 4, 2008, the court heard oral argument on Liberty's objections. *See* DE 31 (minute entry). After considering Liberty's presentation, the court adopted the recommendation to dismiss the complaint, but granted Liberty leave to submit an amended complaint within 30 days. In doing so, the court "admonished" Liberty's counsel that in the future he must "file proper papers." DE 31.

Liberty filed its Amended Complaint on October 3, 2008. It pleaded the same five causes of action (albeit against a slightly different permutation of defendants), but added certain factual allegations aimed at curing the deficiencies in the original pleading.[10] DE 32. Over the next few weeks, Liberty served the Amended Complaint on four of the six named defendants. DE 33 (affidavit of service on BKI on October 23, 2008); DE 34 (affidavit of service on Big A on October 23, 2008); DE 35 (affidavit of service on Kurbatsky on October 28, 2008); DE 33 (affidavit of service on Savranskiy on October 29, 2008). As far as the docket reflects, Liberty has never served the Amended Complaint on either of the Car Service Defendants. None of the defendants has answered the Amended Complaint, and Liberty has done nothing to prosecute the

---

[10] The original complaint inexplicably asserted a cause of action for breach of contract against all defendants; the new one does so only against Bella, the party with whom Liberty actually had the contractual relationship at issue. While deleting the contract claim against several defendants, the Amended Complaint also names new defendants to one claim: specifically, the fourth cause of action originally accused only BKI and Big A of intentional misrepresentation; the corresponding claim in the Amended Complaint makes the same accusation against individual Broker Defendants Kurbatsky and Savranskiy. *Compare* DE 1 ¶¶ 93-94 *with* DE 32 ¶¶ 98-102. While the latter claims rest to some extent on new factual allegations that are at odds with the proof Liberty has previously submitted, as described above, I do not consider here the quality of Liberty's pleading or the likelihood of its success on the merits. My renewed recommendation of dismissal with prejudice rests solely on Liberty's continued pattern of inaction.

case in the more than six months that have passed since it served Savranskiy on October 29, 2008.

On April 7, 2009, I issued an order to show cause why I should not recommend dismissal. After briefly describing the procedural posture, including Liberty's failure to serve two defendants within the time prescribed under Federal Rule of Civil Procedure 4(m) and its failure to seek default remedies against the remaining defendants, I explained the concern that prompted me to issue the order:

> Liberty's latest failures to file proper papers as required to vindicate its rights reflect a continuation of the same lapses that previously prompted me to recommend dismissal with prejudice. The fact that Liberty has continued to ignore this case after the court's admonition in giving it a second chance to pursue its claims serves only to underscore its consistent failure to prosecute the action. In light of the history of this case, further steps by this court to prod Liberty to assert its rights rather than suffer the consequences of its inaction might undermine public confidence in the court's impartiality. It would therefore be entirely appropriate for the court to dismiss the Amended Complaint with prejudice now, without any affording Liberty any further opportunity to be heard. Nevertheless, in an abundance of caution, rather than simply recommend that the court take such action now, I direct Liberty to show cause in writing no later than April 14, 2009, why I should not issue a Report and Recommendation urging the court to dismiss the Amended Complaint with prejudice for failure to prosecute.

DE 37 at 2.

Liberty submitted a timely response, but in doing so it made no attempt to explain its lapses or show cause why the case should not be dismissed. In its one-page letter dated April 14, 2009, Liberty apologized "for the inconvenience and delay in seeking default remedies against the defendants," and asked leave to do so within ten days.[11] DE 38. With respect to its failure to

---

[11] Liberty did not then, and indeed has never, been under any obligation to seek or obtain the court's permission to make a motion for the entry of default. *See* Fed. R. Civ. P. 55(a). Nevertheless, in almost four weeks since Liberty expressed its desire to commence default proceedings within ten days, it has not done so – despite the fact that when pressed to commence

serve the Car Service Defendants, Liberty asserted that they "are represented by counsel and were served with the Amended Complaint by way of their counsel who appeared on behalf of these defendants by the filing of an answer to the Complaint dated September 14, 2007 (D.E. 19)." *Id*. Notwithstanding that assertion, Liberty has not to date filed an affidavit of such service on the docket.

At a more fundamental level, Liberty's response wholly missed the point. It did nothing to explain Liberty's continued failure to pursue its claims after repeated court warnings against such indolence, nor did it address the concern that further coddling by the court of its lapses would be inconsistent with the court's neutral role. Nevertheless, at the risk of further jeopardizing public confidence in such neutrality, I gave Liberty one more chance to address the issue and explain its conduct. On April 14, 2009, I entered the following order:

> The concern about fairness, even to a defaulting defendant, is both real and legitimate. The court's role is to ensure that each side has a fair opportunity to litigate its claims on the merits – not to ensure that one side takes advantage of that opportunity simply because the other has not. Liberty has done nothing either to explain its continued inaction or to justify recruiting the court to serve as its agent for purposes of ensuring that it does not unwittingly abandon a viable claim. It has simply asked the court to ignore its lapses yet again without even attempting to show why such forbearance is in the interest of justice rather than a subversion of the court's role as a neutral arbiter. I will afford Liberty one final opportunity to provide such a substantive explanation in writing no later than April 16, 2009.

DE 39 at 1-2.

Liberty timely responded with a short letter. After reminding me that dismissal for lack of prosecution is a harsh remedy, Liberty noted that such a result "would forever bar Plaintiff

---

default proceedings on the first Complaint, it was able to do file the perfunctory papers needed for such a request within a single day. *See* DE 11; DE 12; DE 13; DE 14.

from seeking justice for its meritorious claims against defendants." DE 40 at 1. Conceding that "this matter has not been litigated expeditiously," Liberty asserted that it did not deserve such ill treatment. *Id*. In attempting to support that assertion, Liberty acknowledged that there are several factors relevant to a consideration of dismissal for failure to prosecute – and proceeded to address exactly one of them. Specifically, Liberty argued that the defendants have not been prejudiced by its extensive foot-dragging. *Id*. Liberty went on to make yet another promise of prompt action – although, inexplicably, it did so in the context of purporting to explain that the defendants would not be prejudiced: "defendants ... in no way will be prejudiced, as Plaintiff fully intends to move forward in this litigation by seeking remedies against [them]." *Id*. at 1-2. In more than three weeks since promising such action, Liberty has done nothing.

II.    Discussion

A district court has the inherent power to manage its own affairs so as to achieve the orderly and expeditious disposition of cases. *Lewis v. Rawson*, --- F.3d ----, 2009 WL 1119651, at *4 (2d Cir. Apr. 28, 2009) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). Consistent with that inherent authority, the Federal Rules of Civil Procedure explicitly empower a district court, in the exercise of its sound discretion, to dismiss an action "[i]f the plaintiff fails to prosecute[.]" Fed. R. Civ. P. 41(b); *see Lewis*, 2009 WL 1119651, at *4 (noting that standard of review is abuse of discretion). "Although the text of [Rule] 41(b) expressly addresses only the case in which a defendant moves for dismissal of an action, it is unquestioned that Rule 41(b) also gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute[.]" *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (citing *Link*, 370 U.S. at 630).

Because dismissal on such grounds is unquestionably a harsh remedy that should be used only in extreme situations, *Lewis*, 2009 WL 1119651, at *4 (internal citations omitted), a court considering such an action should examine five factors. Specifically, the court should consider whether

> (1) the plaintiff's failure to prosecute caused a delay of significant duration; (2) plaintiff was given notice that further delay would result in dismissal; (3) defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and (5) the trial court adequately assessed the efficacy of lesser sanctions.

*Lewis*, 2009 WL 1119651, at *4 (quoting *Drake*, 375 F.3d at 254). No one factor is dispositive. *Id*. In weighing the five factors, the court must consider the record of the entire case as a whole. *Id*.

Liberty's failure to prosecute has unquestionably caused significant delay. Even if the court considers only the delays associated with prosecuting the claims in the Amended Complaint, the delay has been unduly long. Liberty has not commenced default proceedings for the over four months since it was in a position to do so with respect to the Broker Defendants, and it has still failed to serve (or at a minimum to file proof of service upon) both of the Car Service Defendants. But restricting the court's assessment of the circumstances to Liberty's delay with respect to the Amended Complaint would be a windfall to Liberty: as the history of this case makes clear, Liberty's inertia has lasted throughout the entire 26-month history of this action. Aside from Kurbatsky's nominal answer to the initial Complaint, Liberty has faced literally no opposition to its claims from any defendant – and yet, more than two years after starting the litigation, Liberty is no closer to obtaining, or even seeking, a resolution of the merits than it was after it first served some (but not all) of the defendants in April 2007. Moreover, but

for the court's repeated attempts to stir Liberty to action, the case would plainly not have made such limited progress as it has. Viewing the record as a whole, as the court must, it is clear that the first factor weighs heavily against Liberty's position that the case should continue.

The second factor weighs just as heavily on the side of dismissal. Liberty has been warned time and again of the potential consequences of its continuing failures to prosecute this case, and has repeatedly been told to show cause why those lapses should not result in a dismissal. There can be no dispute that Liberty has known that its indolence might result in the dismissal of its claims – and yet that indolence has persisted.

The third factor – and the only one that Liberty has addressed in arguing that the case should not be dismissed – focuses on prejudice to the defendant. In one sense of course, Liberty is correct: none of the defendants appears to be willing or able to contest the lawsuit, and thus none can possibly be prejudiced by the fact that Liberty's failure to prosecute has postponed the date of the otherwise inevitable judgment against them. But that view of the prejudice factor leaves out an important point: Liberty has shown literally no willingness or ability to prosecute this case without extensive prodding and guidance from the court. It commenced the case with a defective pleading, it let the matter sit until directed to begin seeking default remedies, and its actions in pursuing such relief were procedurally and substantively defective – all of which led to the dismissal of its original Complaint. Having been granted a second chance, Liberty again did nothing to secure its claimed right to judgment after filing its Amended Complaint. In light of this history, it is fair to wonder if Liberty could or would *ever* secure a valid judgment against the defendants without a level of assistance from the court that would be entirely inappropriate. Stated another way, further delay may severely prejudice the defendants because it will allow

Liberty to take advantage of repeated wake-up calls from the court to secure a judgment that, left to its own devices, it would never achieve.[12]

The fourth factor – which balances the court's interest in alleviating docket congestion against Liberty's right to an opportunity for a day in court – also weighs heavily against Liberty. Liberty has had extensive opportunity to have its day in court. Indeed, it has had literally hundreds of days in which its attorney could have filed a motion that would have secured a default judgment against some or all of the defendants. But through a combination of substantive defects in its legal submissions, procedural lapses, and simple inaction, Liberty has let those hundreds of days pass without taking advantage of its opportunity. In the meantime, the court's interest in controlling its docket has not abated – but it has needlessly expended significant efforts to make sure that Liberty's claims did not sit unresolved.

It is in connection with this fourth factor that the court should consider Liberty's argument that a dismissal with prejudice "would forever bar Plaintiff from seeking justice for its meritorious claims against [the] defendants." DE 40 at 1. To be sure, if Liberty's substantive claims are correct, it would be a windfall to the defendants for them to escape liability for the fraudulent conduct described in the Amended Complaint. Depriving Liberty of the recovery to which it might otherwise be entitled would likewise be unjust to those consumers who are forced

---

[12] I emphasize that I do *not* rest my analysis of the prejudice factor on case law that establishes a presumption that a plaintiff's unreasonable delay will normally prejudice the defendants. *See*, *e.g.*, *Shannon v. General Elec. Co.*, 186 F.3d 186, 195 (2d Cir. 1999) (citing *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37 (2d Cir. 1982). Although Liberty has done nothing to dispel the prospect of prejudice to the defendants arising from lost evidence or the possibility that the passage of time has made discovery more difficult, *see Romandette v. Weetabix Co.*, 807 F.2d 309, 312 (2d Cir. 1986), my hesitancy to recommend the harsh sanction of dismissal without good cause leads me to give Liberty the benefit of the doubt on that score.

to subsidize Liberty's losses to such fraudulent schemes through the payment of higher premiums.  There are unquestionably several forms of injustice that arise from the possibility that Liberty would lose the right to secure recovery on meritorious claims.  But under the circumstances of this case, Liberty can blame only itself if any such injustice occurs.

Liberty's argument that a dismissal "would forever bar [it] from seeking justice"  is unpersuasive for several reasons.  First, it is almost certainly untrue:  if, as seems most likely, Liberty's failure to prosecute a meritorious claim is attributable to its attorney's failure to discharge his duties, then Liberty will not forever lose the opportunity to seek justice.  To the contrary, it may well have a relatively straightforward claim against a different defendant that will lead to complete recovery of the damages it could have obtained here through more assiduous work by its counsel.  On the other hand, if the fault for Liberty's failure to prosecute lies with a client that somehow stood in the way of counsel's diligent efforts to pursue the lawsuit, then, as unjust as it might be for the defendants to reap a windfall, it would hardly be unjust for Liberty to have to live with the easily foreseeable consequences of its own choices.  Second, even if Liberty might "forever" lose the opportunity to secure relief on its claims, as explained above it would do so only after having voluntarily given up many similar opportunities in the past – opportunities that Liberty passed up while knowing that it had an obligation to pursue its claims with reasonable diligence.

Third, if by "justice" Liberty intends to refer to a judgment in its favor – or, even more speculatively, the actual recovery of money damages by virtue of such a judgment – it is hardly a given that allowing the case to continue will result in such "justice."  Liberty's claims against most of the defendants were legally insufficient as asserted in the original Complaint, and its

Amended Complaint seeks to cure those deficiencies through the addition of several factual allegations that appear to be at odds with proof that Liberty has previously submitted. While it is of course entirely possible that Liberty would be able, in the exercise of a level of diligence it has thus far not shown, to prove liability and damages with respect to each of its claims against each defendant, such a result is far from a foregone conclusion. Moreover, even if Liberty were finally to pursue this case and secure a judgment against some or all of the defaulting defendants, it is hardly certain that Liberty would achieve just recompense as a result: the fact of the default suggests that any defendant against whom Liberty might prevail is indifferent to the outcome of this case, possibly as the result of being judgment-proof.

In that regard, I note that Liberty has quite recently abandoned another case against the Broker Defendants in this action (as well as against other car service defendants) after having its complaint dismissed with leave to amend for deficiencies similar to those that plagued this case. *See Liberty Mut. Ins. Co. v. Luxury Transp. Mgmt., Inc.*, docket no. 07-CV-0608 (RJD), DE 35 (notice of voluntary dismissal dated April 20, 2009); *Liberty Mut. Ins. Co. v. Luxury Transp. Mgmt., Inc.*, 2009 WL 1033177 (E.D.N.Y. Apr. 16, 2009) (dismissing defective complaint with leave to amend, and dismissing with prejudice claims against defendant Kurbatsky for failure to prosecute). Similarly, Liberty also abandoned yet another case against Big A, Savranskiy, and others, notwithstanding those defendants' default. *See Liberty Mut. Ins. Co. v. Global Transp. Mgmt., Corp.*, docket no. 07-CV-1166 (ENV), DE 19 (notice of voluntary dismissal dated April 20, 2009). Plainly, at least with respect to the Broker Defendants, Liberty can and does manage to secure results that it finds satisfactory without pursuing judgments in court. Viewed in this

light, Liberty's prediction that it will be forever robbed of an opportunity to secure justice in this case if the action is dismissed rings rather hollow.

The final *Drake* factor is the efficacy of lesser sanctions. It is this factor more than any other that gives me pause in recommending the harsh remedy of dismissal. I have no doubt that if the court issues enough reminders, orders, and threats, Liberty will eventually do what is needed to secure whatever relief it is legally entitled to recover.[13] In that sense, of course, the potential efficacy of lesser sanctions weighs heavily against dismissal. I believe that is the wrong way to consider this factor.

If Liberty's failure to prosecute had, by virtue of the passage of time, put the defendants in a position in which they could not fairly defend themselves against the pending claims, some lesser sanction might well adequately address the harm. For example, the preclusion of evidence or an adverse inference instruction to the jury might level the playing field enough that both sides could still fairly litigate the claims on the merits. If that were the case, I would not recommend dismissal here. But Liberty's failure to prosecute has had the effect of precluding any resolution of the case at all, and it is therefore not amenable to such remedial measures. The

---

[13] Indeed, Liberty has now twice promised to seek default judgments against the defendants who have failed to respond to the Amended Complaint. To some extent, those promises inspire little confidence: in the weeks since Liberty was again warned of the potential consequences of its inaction, it has done nothing to commence default proceedings (or to file proof of service of the Amended Complaint on the Car Service Defendants) despite its ample opportunity to do so simply by requesting that the Clerk note the defaults. *See* Fed. R. Civ. P. 55(a). More fundamentally, the fact that Liberty might actually be stirred to action by my repeated orders to show cause is not a saving grace; it is instead the problem. This court may plainly order dismissal notwithstanding such a response to a warning of impending dismissal, for subsequent diligence is no excuse for past negligence. *United States v. Pacific Fruit & Produce Co.*, 138 F.2d 367, 372 (9th Cir. 1943) (quoting *Hicks v. Bekins Moving & Storage Co.*, 115 F.2d 406, 409 (9th Cir. 1940).

problem here is not so much that Liberty has been acting slowly, but that it has not been acting at all except when prodded, cajoled, or commanded by the court. In light of the history of this case since the dismissal of the first Complaint – which was itself due in part to Liberty's failure to prosecute – it appears that Liberty's inertia will continue unless and until the court prods it to action once again. As a result, any lesser sanction that allows Liberty to proceed with its claims at this stage necessarily undermines the court's impartial role. Just as it is not the court's responsibility to ensure that the defendants consult counsel and answer the complaint, it is not – and must not become – this court's job to ensure that Liberty is protected against its own lapses. If the court takes on such an obligation, it will implicitly be taking sides in the legal dispute between Liberty and the defendants.

The difficulty, of course, is determining whether the court may – and must, consistent with the second *Drake* factor – continue to prod Liberty to action by warning it of the possibility of dismissal for failure to prosecute, or whether instead the proceedings have reached the point where such continued warnings fundamentally alter the court's neutral role. I believe that in light of the extensive delays and warnings described above, we have finally reached the latter point. I therefore conclude that while some sanction short of dismissal might indeed suffice to break through Liberty's inertia, any such lesser sanction would be detrimental to the court's integrity as an institution for the fair resolution of legal disputes.

None of the *Drake* factors is dispositive. But each of them either weighs heavily in favor of dismissal or, at a minimum, is essentially neutral. Weighing all of those factors together and assessing them against the record of the entire case as a whole, I am compelled to recommend that the court dismiss the Amended Complaint with prejudice for failure to prosecute.

III.      Recommendation

I hold no brief for the defendants who, as evidenced by their failure to contest Liberty's claims, apparently take no issue with the charge that they have engaged in serious misconduct. But the responsibility for ensuring that the defendants do not escape liability for their alleged fraud is Liberty's, not the court's. Liberty has entirely abdicated that responsibility, and this court should no longer protect it from the consequences of having done so. For the reasons set forth above, I respectfully recommend that the court dismiss the Amended Complaint with prejudice based on the plaintiff's failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

IV.      Objections

I direct the plaintiff to serve a copy of this Report and Recommendation on the defendants by certified mail, and to file proof of service with the court no later than May 18, 2009. *See* Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(a), (d). Any objections to this Report and Recommendation must be filed no later than June 1, 2009. Failure to file objections within that period, absent the entry of an order extending that deadline pursuant to Federal Rule of Civil Procedure 6(b)(1), will waive the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
       May 11, 2009

                                     /s/ James Orenstein
                                     JAMES ORENSTEIN
                                     U.S. Magistrate Judge